UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>      v.<br><br>LUIS SANTIAGO,<br>   a/k/a "King Tiny"<br><br>      Defendant | Criminal No. 19-CR-10459-RWZ |

## MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION AND RESPONSE TO OBJECTIONS TO PRESENTENCE REPORT

The government submits the instant memorandum in support of its recommendation of 66 months. While on probation, and after a prior conviction for a vicious armed robbery, the Defendant fired a gun at rival gang member, and distributed controlled substances in support of the Latin Kings. For this Defendant, a 66-month sentence is fair and just, as it appropriately reflects the Defendant's extensive criminal record of drug offenses, his history of gang violence and threats, his prior committed sentences, and the fact that he has continued to commit violence while detained pretrial. A sentence of 66 months will sufficiently punish the Defendant, adequately protect the public, and generally accords with the sentencing factors under 18 U.S.C. § 3553(a).

## THE ADVISORY SENTENCING GUIDELINES[1]

On September 10, 2020, the Defendant pled guilty to Count One of the Indictment, charging Conspiracy to Conduct Enterprise Affairs Through a Pattern of Racketeering Activity, in violation of 18 U.S.C. § 1962(d). The Defendant pled guilty pursuant to a Plea Agreement

---

[1] References are as follows: entries on the public docket by entry number (D. _); presentence investigation report (PSR) are by paragraph (PSR ¶_) or page (PSR, p. _). The U.S. Probation Department is referred to as "Probation."

1

under Fed. R. Crim. P. 11(c)(1)(B) (D. 1223), wherein the government agreed to a total offense level calculation of 21, and the agreed to recommend a sentence within the guidelines sentencing range calculated by the Court. In the plea agreement, the Defendant took the position that the total offense level was 20. See D. 1223. By contrast, Probation has calculated the total offense level to be 19. See PSR ¶91.

## I.  OFFENSE LEVEL CALCULATION IN PRESENTENCE REPORT

The government contends that its offense level calculation set forth in the plea agreement should control. See D. 1223. The government recites that calculation here for completeness and ease of reference:

Group One:

*Base Offense Level*:   14, under USSG § 2A2.2(a), because the Defendant is responsible for an aggravated assault;

*Specific Offense Characteristics:*   +2, under USSG § 2A2.2(b)(1), because the assault required more than minimal planning

+5, under USSG § 2A2.2(b)(2)(A), because the Defendant discharged a firearm

*Total:*   21

Group Two:

*Base Offense Level*:   18, under USSG § 2D1.1(c)(11), because the Defendant is responsible for at least 11.2 gram but less than 16.8 grams of cocaine base

*Specific Offense Characteristics:*   +2, under USSG § 2D1.1(b)(1), because the Defendant possessed a dangerous weapon, including a firearm;

+2, under USSG § 2D1.1(b)(2), because the Defendant used violence, made a credible threat to use violence, or directed the use of violence.

      *Total:*   22

Grouping:

| | |
|---|---|
| Group One (21 OL): | 1 Unit (within 4 levels, under USSG § 3D1.4(a)) |
| Group Two (22 OL): | 1 Unit (highest offense level, under USSG § 3D1.4(a)) |

*Additional Offense Level:* +2

*Acceptance of Responsibility:* -3, because the Defendant has promptly accepted personal responsibility for the offense of conviction, USSG § 3E1.1

*Total Offense Level:*  21.

To the extent that the offense level calculation stated in the PSR differs from the Plea Agreement, the government objects. See PSR ¶¶70-91.

## II. CRIMINAL HISTORY

The government agrees with Probation's calculation of criminal history in the PSR; the Defendant has 8 criminal history points, including 2 points for the commission of the offense while on Probation from the Taunton District Court for Escape from a DYS facility. See PSR ¶¶93-107.[2]

The government agrees that the Defendant is Criminal History Category IV (PSR ¶100).

As such, the government contends that the Total Offense Level is 21, and Criminal History Category is IV, resulting in a Guidelines Sentence Range of 57-71 months.

## ARGUMENT

### I. APPLICATION OF THE SENTENCING GUIDELINES

The government bears the burden of proving the facts "supporting an enhancement by a preponderance of the evidence." United States v. Damon, 595 F.3d 395, 399 (1st Cir. 2010). In

---

[2] The DYS sentence from which he escaped was imposed in relation to an armed and masked robbery, and assault and battery by means of dangerous weapon. See PSR ¶93.

3

finding the facts supporting an enhancement, "[a] sentencing court is entitled to rely on circumstantial evidence and draw plausible inferences therefrom." United States v. Marceau, 554 F.3d 24, 32 (1st Cir. 2009); United States v. Paneto, 661 F.3d 709, 716 (1st Cir. 2011).

A sentencing court "must take pains to base [its] sentencing judgments upon reliable and accurate information." United States v. Tavano, 12 F.3d 301, 305 (1st Cir. 1993). Thus, it may take into account "any information that has sufficient indicia of reliability." United States v. Díaz-Arroyo, 797 F.3d 125, 130 n.3 (1st Cir. 2015). In doing so, it has "wide discretion to decide whether particular evidence is sufficiently reliable to be used at sentencing." United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010).

### A.    Minimal Planning Adjustment

The government disagrees with Probation's failure to include specific enhancement to Group One for more than minimal planning under USSG § 2A2.2(b)(1). "For purposes of subsection (b)(1), 'more than minimal planning' means more planning than is typical for commission of the offense in a simple form." See USSG § 2A2.2(b)(1), cmt. 2. In this case, the assault itself was well planned and consisted of multiple Latin Kings members proceeding to the area where the rivals were present. A codefendant elected to secretly bring and then introduce a firearm into what was appears to have originally been a fist fight. The Defendant received the firearm, chased the rival gang member, and fired. Thereafter, the Latin Kings enterprise sprung into operation to ensure the gang members safely escaped. A vehicle owned by the leader of the Chapter, Jorge Rodriguez, was observed to be the getaway vehicle, collecting the numerous Latin Kings members and providing transportation from the scene. Both the planned and secretive introduction of a firearm to the incident, and the availability of on-demand transportation from the scene by the leader of the sprawling criminal enterprise distinguishes this

incident from a typical shooting, and merits the imposition of the 2 level enhancement.

      **B.**     **Specific Offense Characteristics for Group Two**

The government disagrees with Probation's failure to include specific offense characteristic adjustments to Group Two under USSG § 2D1.1(b)(1) and USSG § 2D1.1(b)(2). Both should apply.

As an initial matter, both enhancements can be applied together and the commentary specifically addresses such a circumstance.[3] Additionally, the application of these specific offense characteristics in the context of an aggravated assault group does not constitute "double counting." As the First Circuit has observed, "[t]he Sentencing Commission has shown itself fully capable of expressly forbidding double counting under the guidelines when appropriate," United States v. Chiaradio, 684 F.3d 265, 283 (1st Cir. 2012), and it "has not been bashful about explicitly banning double counting in a number of instances." United States v. Lilly, 13 F.3d 15, 19 (1st Cir. 1994) (collecting examples). Accordingly, "when neither an explicit prohibition against double counting nor a compelling basis for implying such a prohibition exists, courts should be reluctant to read in a prohibition where there is none." Chiaradio, 684 F.3d at 283 (internal quotation marks and citation omitted); see United States v. Fiume, 708 F.3d 59, 62 (1st Cir. 2013) ("Multiple sentencing adjustments may derive from 'the same nucleus of operative facts while nonetheless responding to discrete concerns.'").

No such prohibition is noted in the guidelines and this Court should apply both enhancements, which clearly apply given the aggravated assault that took place during the Defendant's membership in the racketeering conspiracy. See, e.g., United States v. Martinez,

---

[3] See USSG § 2D1.1, cmt .11(B) ("The enhancements in subsections (b)(1) and (b)(2) may be applied cumulatively (added together), as is generally the case when two or more specific offense characteristics each apply.").

5

Crim. No. 12-132, 2019 WL 302604, at *5-6 (W.D. Mich. Jan. 23, 2019) (Neff, J.) (applying both § 2D1.1(b)(2) and § 2A2.2(b)(3)(C)) and finding no double counting where "enhancements were focused on different aspects of that conduct, with distinct harms"). Consequently, the offense level for Group Two should be increased by 4, consistent with the government's position in the Plea Agreement, and as stated above.

## II. THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553

The government requests that the Court impose a sentence of 66 months. This Defendant is a young man whose history of violence stretches back into his adolescence, where, at age 17, he committed a vicious armed and masked robbery, where the victim suffered extensive injuries. See PSR ¶93. Rather than rehabilitate, the Defendant continues to choose violence, and continued membership in an organization predicated upon violence.

### A. Nature and Circumstances of the Offense

The government urges this Court to consider how the Defendant's conduct directly endangered the public through gunfire, and indirectly facilitated the despair and degradation of his community and addiction of others. In the context of this criminal organization, the Defendant epitomizes the two-headed damage to the community and danger of violence that the Latin Kings brought to the community of New Bedford. While recruited as a young man into this organization, the Defendant has continued to flout opportunities to exit from a life of violence and crime.

### B. Criminal History

Though only 22, the Defendant has earned the distinction of being in criminal history category IV.[4] While age is usually a consideration that would militate towards leniency, in this

---

[4] Based on the 2019 data from the United States Sentencing Commission, only 14.1% of offenders in the federal system score higher than the Defendant (Category V and VI), and 9.3% of offenders score

6

case the opposite is true. The Defendant's age and quick succession of arrests and convictions prove his commitment to the use of violence and drug trafficking that are characteristic of membership in the Latin Kings. Indeed, the Defendant's criminal history and facts of his prior convictions fully capture the mindset of an individual focused upon street life and exerting control through violence, much like the organization he served.

For example, less than four years before his arrest in this case, at age 17, the Defendant participated in a brutal armed robbery of a convenience store. See PSR ¶93. The Defendant and three others entered a store with firearms and forced the clerk to the ground at gunpoint. While on the ground, the robbers struck the clerk with a firearm, and kicked him numerous times. As a result of this beating by the Defendant and his crew, the clerk suffered broken ribs, a broken finger, a broken eye socket and received eight staples in his head. During the robbery, a customer entered the store, and the Defendant and his coconspirators forced him to ground as well, and stole his wallet. All of this, for several cartons of cigarettes.

While incarcerated for this incident, "the defendant showed little, if any, responsibility for his actions and stated that these situations just happened and he somehow got involved in them. DYS records also note conversations with juvenile probation which reflect constant violations of probation by way of new charges, and suspected gang involvement with the Latin Kings from an early age." PSR ¶93.

Because he was convicted but not actually incarcerated for this incident, his violence continued. Five months after conviction for the armed robbery, the "defendant threatened to kill a neighbor and her son during an argument." See PSR ¶96. The reporting neighbor clearly was

---

in the same category as the Defendant (IV). See United States Sentencing Commission, Figure 7, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Figure07.pdf

7

in fear and aware of the Defendant's potential for violence; she told the police that she "believed the defendant's threat because she knew him to be a Latin King gang member and knew him to have previously been involved in a firearm incident." See PSR ¶96. Three days after threatening to kill his neighbor, the Defendant was arrested for operating a stolen motor vehicle. See PSR ¶95.

Finally, the Defendant was incarcerated in a DYS facility and the entries on his criminal record stop for a short period. However, this too was not enough as the Defendant and four others escaped from a DYS facility in Taunton. See PSR ¶97. A nearby resident reported an unknown individual in her yard, and the Defendant was taken into custody one police arrived. Now an adult, when charged with escape in Taunton District Court, the Defendant received another non-incarcerated sentence in May of 2017. See PSR ¶97 (noting an initial continuation without a finding before imposition of guilty finding).

As soon as his committed sentence to DYS until the age of 21 ended, the Defendant's crimes continued and accelerated. See PSR ¶¶102-107. He was twice arrested for drug distribution, operating an uninsured motor vehicle, and for the shooting incident taking place on May 2019. See PSR ¶¶102-107. Put simply, within a one-year period, the Defendant was charged in five separate cases. See PSR ¶¶102-107.

And yet, even when incarcerated the Defendant continues to commit violence and, as is evident, escape punishment. For example, the PSR indicates that the Defendant has accrued multiple disciplinary violations, including one for having "participated in a group assault of another inmate on December 26, 2019." See PSR ¶4.

### C. This Court Must Protect the Public

A 66-month sentence is sufficient but no greater than necessary to achieve the goals of

sentencing.  See 18 U.S.C. § 3553(a).  To start, a sentence of this length adequately reflects the seriousness of the offense.  As the evidence proved, this Defendant fired a weapon at a rival gang member, in a densely-populated city already ravaged by gun violence and drugs.  Mere fortuity prevented this extremely serious case from reaching a much more tragic end.  Not only did the Defendant place the victim in potentially fatal danger, he placed the entire community in danger from the reckless gunfire and all of his other violent gang activity in residential neighborhoods.[5]

    A significant sentence will also serve the goal of specific deterrence and just punishment.  Even though he has been arrested many times, been sentenced, and repeatedly violated probation, the measure of leniency that the Defendant received in state court has only emboldened him.  Indeed, the Defendant's criminal history demonstrates how stubbornly he has clung to crime, violence, and firearms, despite his age, (PSR ¶¶121-123), and prior committed sentences (PSR ¶¶93, 95, 96, 97).  None of his prior interactions with the justice system have sufficiently impressed upon the Defendant that further crimes, especially violent crimes, are unacceptable.  The time has come for a sentence that will specifically deter this Defendant from committing further crimes, and punish him for his significant contributions to the terror and violence that the Latin Kings brought to the streets of New Bedford.

    General deterrence is also a consideration that this Court must take into account for this violent, repeat offender.  See 18 U.S.C. § 3553(a)(2)(B).  The sentence that this Court imposes must advance the sentiment that violence in communities, and dealing drugs to facilitate a criminal enterprise, are entirely unacceptable, and are especially intolerable for repeat offenders.  ***Though a young man, this Defendant has repeatedly chosen a path of violence and hurting***

---

[5] The Detention Affidavit is replete with instances in which gang-related gunfire struck the intended target, or a bystander, was used to intimidate citizens or rival gang members, or resulted in death.  See D. 12-1.

***others, and profiting from the misery of others' addictions.  This Court should sentence this Defendant in a manner that deters this Defendant and others from choosing the same path.*** A 66-month sentence achieves that goal.

Lastly, the government notes that a sentence of 66 months accords with a sense of proportionality and relative culpability among the numerous codefendants charged in this case.[6] This Court has, thus far, sentenced one codefendant who was personally responsible for a shooting where no one was struck: codefendant Juan Figueroa, a/k/a "King Pun," who was also a member of the New Bedford Chapter.  As this Court may recall, Figueroa received a 24-month sentence for a shooting of Victim 9 taking place in June 2019.  See D. 1540 (imposing 24-month sentence on December 9, 2020).  Figueroa presented much differently than this Defendant: Figueroa battled cancer as a young man, and this federal case was Figueroa's first conviction.  By comparison, Santiago is in Criminal History Category IV at age 22, and committed the shooting incident in this case despite being on probation at the time and having been afforded multiple prior opportunities for rehabilitation throughout his life (i.e., juvenile probation, DYS commitment, adult probation, and an adult committed sentence).  While Figueroa received a 24-month sentence for his first conviction, this conviction will be the Defendant's fifth, and the Defendant was also on probation at the time of the shooting.  Consequently, a 66-month sentence properly comports with a sense of proportionality that should overarch sentences of codefendants in the same organization, charged in the same case.

All of the information in the PSR, when considered in light of the sentencing factors

---

[6] See United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008) ("district courts have discretion, in appropriate cases, to align codefendants' sentences somewhat in order to reflect comparable degrees of culpability — at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system").

discussed above, reveals that this Defendant simply refuses to conform his conduct to the law. The nature of the crime and the characteristics of the Defendant compel this Court to impose a sentence at the high-end of the guidelines. Specific deterrence, general deterrence, just punishment, and public protection therefore, would all be similarly well served by a sentence at the mid-range of the guidelines as calculated by the government. For this Defendant, 66 months is the proper sentence.

## CONCLUSION

Based on the foregoing, the Court should determine that the Defendant's total offense level is 21, and impose a sentence of 66 months.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD

Date: December 28, 2020              Assistant U.S. Attorney